=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 181
In the Matter of Maureen Kigin,
          Appellant,
        v.
State of New York Workers'
Compensation Board et al.,
          Respondents.

          Robert E. Grey, for appellant.
          Paul Groenwegen, for respondent State of New York
Workers' Compensation Board.
          Jill B. Singer, for respondent Special Funds
Conservation Committee.

PIGOTT, J.:

          The primary issue presented on this appeal is whether

the Workers' Compensation Board (the Board) exceeded its

statutory authority when it promulgated portions of the "Medical

Treatment Guidelines" (see 12 NYCRR 324.2 [a]-[f]).  We hold that

it did not and therefore affirm the Appellate Division.

- 1 -

I.

In 2007, as part of its comprehensive reform of the Workers' Compensation Law, the Legislature amended Workers' Compensation Law § 13-a (5) in two ways: (1) it raised from $500 to $1,000 the maximum cost of specialist treatments for which the employer is automatically liable without prior authorization, and (2) it directed that the Board issue and maintain a list of pre-authorized procedures that a claimant can obtain at the employer's expense even if the cost exceeds $1,000, without the need for the employer's prior approval.  The purpose of both of these provisions was to "remove impediments to prompt diagnostic and treatment measures and to better reflect current medical service costs.  The provision permitting the creation of a pre-authorized list allows the Board appropriate regulatory flexibility to add or remove procedures depending on best practices, increases and decreases in cost, or opportunities presented by managed care approaches" (Governor's Program Bill Memorandum, Bill Jacket, L 2007, ch 6).

A task force of credentialed medical professionals was assembled to develop and recommend a set of guidelines for the pre-authorized medical procedures.[1]  In 2010, the Board published proposed regulations, which incorporated by reference the

---

[1]  The guidelines were limited to the treatment of injuries to the low back, cervical spine, knee, and shoulder because those injuries account for a disproportionately large amount of the cost of workers' compensation medical care.

guidelines recommended by the task force.  Following the comment period, the Board adopted the "Medical Treatment Guidelines," which were subsequently incorporated by reference in the regulations (see 12 NYCRR 324.2 [a]).

The Guidelines include the list of pre-authorized medical procedures and set forth limitations on the scope and duration of each procedure.  They also set forth a variance procedure, under which medical treatment providers can, on behalf of a claimant, request authorization for medical care not included in the Guidelines or in excess of the scope and/or duration that is pre-authorized (see 12 NYCRR § 324.3 [a] [1]).  The medical treatment provider requesting a variance must demonstrate that the requested treatment is appropriate for the claimant and medically necessary (see id. §§ 324.3 [a] [2]; 324.3 [a] [2] [i] [a]).

II.

In December 1996, claimant Maureen Kigin, a Hearing Reporter for the Workers' Compensation Board (the Board), injured her neck and back in a work-related automobile accident.  In June 1997, the Board accepted her claim for wage replacement benefits and ongoing medical treatment.  In 2006, Kigin's case was reopened and transferred to the Special Fund for Reopened Cases (hereafter "the carrier") pursuant to Workers' Compensation Law § 25-a.  On December 14, 2006, she was classified as permanently partially disabled.

Claimant alleges that she suffers chronic neck and back pain as a result of her injuries. Her treating physician, Dr. Andrea Coladner, prescribed acupuncture. On November 9, 2009, she received authorization from the carrier for acupuncture three times a week for six weeks.[2]

In March 2011, Dr. Coladner re-evaluated claimant and recommended that she receive additional acupuncture treatment, namely, three acupuncture treatments to her cervical and lumbar spine each month for six months. The doctor again requested authorization from the carrier, this time under the newly-created Medical Treatment Guidelines established by the Board that had become effective on December 1, 2010. Specifically, she requested two variances, one for claimant's cervical spine and another for her lumbar spine. These variances were required because the Guidelines for the treatment of neck injuries provided that the optimum duration of acupuncture treatments is one month and the maximum duration is 10 treatments.[3] Dr. Coladner opined that the treatments would increase flexibility, increase circulation, decrease headaches, decrease muscle

---

[2]  Although Dr. Coladner sought prior authorization for the acupuncture treatment under Workers' Compensation Law § 13-a (5), at that time no such prior authorization was required under that section because the treatments did not involve "specialist consultation" or "special services" within the meaning of that section and would not have cost more than $1,000.

[3]  See New York State Workers' Comp Bd, Neck Injury Medical Treatment Guidelines at 21 (2d ed 2013).

tightness, and allow claimant to maintain function and activities of daily living.

In response to the variance requests, the carrier obtained an independent medical examination of claimant, conducted by Dr. Peter Chiu, a physician board-certified in physical medicine and rehabilitation and certified in acupuncture. Based on his examination, as well as his review of claimant's medical records, Dr. Chiu determined that further acupuncture treatments were not medically necessary. Dr. Chiu noted that claimant's subjective complaints of pain were not supported by objective findings, that she did not suffer from any disability, and that she could resume normal activity of daily living and her occupation without restriction.

Based on Dr. Chiu's findings, the carrier denied the variance requests. Claimant thereafter sought review of the denial.

Dr. Coladner and Dr. Chiu testified as to whether the variances should be granted to allow the additional acupuncture treatment. Dr. Coladner testified that claimant had tried several different treatments and that acupuncture was the treatment modality that helped her maintain her functional level. Dr. Coladner averred that claimant reported a reduction in pain following the acupuncture treatments, although no improvement in her range of motion. Further, Dr. Coladner asserted that additional acupuncture treatments were recommended because,

without it, claimant continued to report worsening pain and therefore diminished function.

Dr. Chiu testified that, in his opinion, the variance was properly denied because the requirements set forth in the Guidelines were not satisfied. Specifically, Dr. Chiu testified that Dr. Coladner's medical records did not include claimant's response to treatment or any improvement in her range of motion.

A Workers' Compensation Law Judge determined that claimant's medical provider failed to show that the additional acupuncture treatments were medically necessary. In particular, the Judge noted that, although Dr. Coladner testified that claimant reported some pain reduction from the prior treatments, there was no evidence in the record that these earlier treatments resulted in the objective improvement of functional outcomes with respect to claimant's neck, or that it was reasonable to expect that further acupuncture would result in such improvement.

On claimant's administrative appeal, the Workers' Compensation Board panel affirmed the Workers' Compensation Law Judge's determination. The Board found that the variance applications failed to meet the burden of proof that the additional acupuncture treatment requested is medically necessary within the meaning of the Guidelines.

III.

Claimant appealed the Board's decision, arguing, as relevant here, that (1) the Board lacked the authority to

promulgate the regulations and incorporated Guidelines, (2) the variance procedure improperly shifts the burden of proof to claimant's physician to prove the medical necessity of a proposed treatment, and (3) the Guidelines violate claimant's due process right to a meaningful hearing.

The Appellate Division, with one Justice dissenting, affirmed (109 AD3d 299 [3d Dept 2013]). The court rejected claimant's argument that the Board exceeded its statutory authority in promulgating the regulations, holding that "the Board acted within its legislatively conferred authority when it devised a list of preapproved medical care deemed in advance to be medically necessary for specified conditions, and did so in a manner consistent with Workers' Compensation Law § 13 (a) and the overall statutory scheme" (id. at 307). In support of its conclusion, the court noted that "medical necessity and appropriateness . . . have always been prerequisites to an employer's obligation" to pay and "the Legislature purposefully conferred the authority on the Board to predetermine medical necessity for medical care, and its scope and duration, consistent with best medical practices" (id. at 306).

The court also rejected claimant's argument that the variance procedure improperly shifts the burden to the claimant's treating physician to prove medical necessity, in conflict with Workers' Compensation Law § 21 (5) (see id. at 307-308). Finally, the court found unavailing claimant's argument that the

Guidelines deprived her of due process, noting that the regulations provide an opportunity to be heard, "an expedited process for determining the medical necessity" of the requested care, and a review process (id. at 310).

The dissenting Justice agreed with the majority's conclusion that the "Board has authority to promulgate reasonable rules and regulations consistent with the Workers' Compensation Law," but disagreed with its "overreaching conclusion that medical treatments falling outside the Guidelines are predetermined and presumed not to be medically necessary" (id. at 312-313 [McCarthy, J., dissenting]). The dissent would have found that the variance procedure conflicts with the statutory scheme and specifically with section 21 (5) (see id. at 313-314). The dissent reasoned that the variance procedure "undermine[s] the remedial purpose of the Workers' Compensation Law and [is] contrary to the legislative purpose behind authorizing the Board to promulgate [the] Guidelines" (id. at 315).

This Court granted claimant leave to appeal.

IV.

Claimant first contends that the Board exceeded its statutory authority to "preauthorize" medical treatment under Workers' Compensation Law § 13-a (5) by using the Guidelines to "pre-deny" medical treatment. The Board responds that the Guidelines are a valid exercise of its broad regulatory authority because the regulations are rationally related to the underlying

policies of the Workers' Compensation Law.

The Board is authorized to "adopt reasonable rules consistent with and supplemental to the [Workers' Compensation Law]" (Workers' Compensation Law § 117 [1]).  Courts will uphold regulations that have "a rational basis and [are] not unreasonable, arbitrary, capricious or contrary to the statute under which [they were] promulgated" (see generally Kuppersmith v Dowling, 93 NY2d 90 [1999]).

We hold that the Board acted properly and lawfully when it promulgated the Guidelines, as they reasonably supplement Workers' Compensation Law § 13 and promote the overall statutory framework of the Workers' Compensation Law, which is to provide appropriate medical care to injured workers.  There is no dispute that the Board was statutorily authorized under section 13-a (5) to issue a list of pre-authorized procedures.  That determination necessarily meant that the Board consider what is not best practice and what may not be medically necessary.  Contrary to claimant's contention, the procedures that are not on the list are not "pre-denied," given the possibility of obtaining a variance.  In other words, treatments that are not in accord with the Guidelines may nevertheless be approved for particular claimants pursuant to the variance procedure.

The establishment of the variance procedure was within the Board's broad regulatory powers (Workers' Compensation Law §§ 13, 141, and 117 [1]).  The Board explained that the prior lack

of standards in assessing the medical necessity of treatment had resulted in "disputes over treatments, delayed care and increased frictional costs" (Notice of Proposed Rulemaking, New York State Register, June 30, 2010, at 33-38).  Disputes over the medical necessity or the frequency/duration of medical care were often made after the care was provided, on a case-by-case basis, when the employer disputed the bill.  It was reasonable for the Board to promulgate uniform guidelines for defining the nature and scope of treatment considered medically necessary.  By adopting the pre-authorized list and variance procedure for determining the necessity of care, the Board provides a measure of avoiding delay and uncertainty that previously resulted from disputes over the medical necessity of treatment.

V.

Claimant next claims that the Guidelines remove the burden of proof from the employer and the carrier and shift it to the injured worker and the treating physician.  This, claimant argues, is directly contrary to the Workers' Compensation Law.

Under the regulations, the burden of proof to establish that a variance is appropriate and medically necessary rests on the treating medical provider (12 NYCRR 324.3 [a] [2]). Whether a treating medical provider has met this burden is a threshold determination that must be made whenever a carrier properly and timely articulates an objection to a variance request.

Contrary to claimant's contention, nothing in the

Workers' Compensation Law has ever precluded the Board from requiring proof of medical necessity from claimant's health care provider.  Indeed, the claimant generally has the burden in the first instance of proving facts sufficient to support his or her claim for compensation (see Matter of Malacarne v City of Yonkers Parking Auth., 41 NY2d 189, 193 [1976] [claimant has the burden of showing that injuries were sustained in the course of employment]).  Moreover, in his argument, claimant relies on the provision of Worker's Compensation Law § 13-a (5) that an employer's or carrier's refusal to authorize "special services" costing more than $1,000 must be based on a "conflicting second opinion" by a board-authorized physician.  That requirement presupposes that the claimant has submitted the first opinion, from his or her treating physician.

    We also disagree with claimant's contention that section 21 (5) of the Workers' Compensation Law establishes that the burden rests on the employer or carrier.  That provision creates a presumption, "[i]n any proceeding for the enforcement of a claim for compensation," that "the contents of medical and surgical reports introduced in evidence by claimants for compensation shall constitute prima facie evidence of fact as to the matter contained therein" (Workers' Compensation Law § 21 [5]).  It is the carrier that then bears the burden of proffering "substantial evidence" to contradict the content of those medical reports (id.).

We agree with the Appellate Division majority that claimants can continue to rely on the presumption, while also satisfying the variance procedure's requirement that they establish the medical necessity of the requested treatment. While the presumption establishes the facts contained in the medical report, the claimant must first establish the medical necessity for the treatment.

VI.

Finally, claimant argues that the Guidelines deny injured workers due process by predetermining their need for medical treatment. She contends that the Guidelines do not provide an opportunity to be heard in a meaningful time and manner.

Generally, procedural due process principles require an opportunity for a meaningful hearing prior to the deprivation of a significant property interest (see Hodel v Virginia Surface Mining & Reclamation Assn., 452 US 264, 303 [1981]). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" (Matthews v Eldridge, 424 US 319, 333 [1976] [internal quotation marks omitted]; see Curiale v Ardra Ins. Co., 88 NY2d 268, 274 [1996]).

The Guidelines provide claimants with a meaningful opportunity to be heard on the denial of any variance request. The variance procedure expressly provides a process for requesting review of the denial of a variance request, under

which the treating medical provider may elect review by a medical arbitrator or through an expedited hearing process (see 12 NYCRR 324.3 [d]).  Indeed, in this case, a hearing was held at which a Workers' Compensation Law Judge considered testimony by both claimant's own care provider and the independent expert engaged by the carrier.  Claimant was represented by counsel, who cross-examined the carrier's expert.  The Workers' Compensation Law Judge's decision was reviewed by the Board, which considered legal arguments by claimant's attorney, and the Board's decision was subject to judicial review.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Matter of Kigin v New York State Workers' Compensation Board

No. 181

RIVERA, J. (dissenting):

I agree that the Workers' Compensation Board acted within the scope of its statutory authority under the Workers' Compensation Law in adopting regulations incorporating a list of pre-authorized medical procedures, and a system for implementing consideration of treatment recommendations not included on the list. However, the Board exceeded its authority when it promulgated regulations imposing a pre-approval requirement that forecloses reimbursement for medical services that vary from the list and the Board's Medical Treatment Guidelines ("Guidelines") in all cases where the services are rendered in advance of approval. Also, to the extent the Board's regulations establish a variance scheme that predetermines that all treatment not included on the pre-authorized list of services is presumptively not medically necessary, it imposed a burden on Kigin and other claimants inconsistent with the statute's language and underlying purpose. Therefore, I would reverse the Appellate Division.

The Workers' Compensation Law "is framed on broad principles for the protection of [workers]" (Waters v William J. Taylor Co., 218 NY 248, 251 [1916]; accord Illaqua v Barr-Llewellyn Buick Co., Inc., 81 AD2d 708, 708 [3d Dept 1981],

- 1 -

citing In re Heitz, 218 NY 148, 154 [1916], and Lorer v Gotham Concrete & Cement Finish Corp., 8 AD2d 221, 224 [3d Dept 1959]), and thus "should be construed liberally in favor of the employee" (Wolfe v Sibley, Lindsay & Curr Co., 36 NY2d 505, 508 [1975]). It is beyond dispute that the Board has broad regulatory power to administer and carry out the mandates of the Workers' Compensation Law (see e.g. Workers' Compensation Law ("WCL") §§ 117 [1]; 141). To that end, the Board is authorized to "adopt reasonable rules consistent with and supplemental to" the statutory scheme (id. § 117 [1]). However, the Board's powers are not limitless, and we review its "administrative regulations to determine whether they are rational and to ensure that they are not arbitrary and capricious" or contrary to the statute under which they are promulgated (Belmonte v Snashall, 2 NY3d 560, 567 [2004]; see Kuppersmith v Dowling, 93 NY2d 90, 96 [1999]).

The Workers' Compensation Law states that employers "shall be liable for the payment of" and "shall promptly provide for an injured employee," medical treatment "for such period as the nature of the injury or the process of recovery may require" (Workers' Compensation Law ("WCL") § 13 [a]). Prior to the Board's regulatory adoption of the Guidelines in 2010, where an employer or provider disputed a request for treatment reimbursement, the parties resolved the dispute pursuant to an individualized determination of whether the request is

compensable after treatment was rendered to the claimant (see
Kigin v State Workers' Compensation Bd., 109 AD3d 299, 306 [3d
Dept 2013], citing WCL §§ 13-g, 13-k, 13-l, 13-m, and Matter of
Spinex Labs. Inc. (Patton), 213 AD2d 884, 885 [3d Dept 1995], and
Employer: Livingston County, 2011 WL 5618432, at *5; see also 110
N.Y. Jur. 2d Workers' Compensation § 565 [after treatment is
rendered, employer must pay or give written notice of the reasons
for nonpayment]).  Only in certain cases where the claimant
sought treatment in the form of "specialist consultations,
surgical operations, physiotherapeutic or occupational therapy
procedures, x-ray examinations or special diagnostic laboratory
tests costing more than [$500]" was the provider required to
obtain preauthorization for the treatment from the employer or
Board in order to obtain reimbursement (WCL § 13-a [5]).  A
denial of preauthorization under this section must be based on "a
conflicting second opinion rendered by a physician authorized by
the board" (id.).

As part of the legislative efforts to streamline
compensation for workers' injuries and increase benefits for
injured workers while reducing costs, in 2007, the Legislature
amended Section 13-a (5) by raising the threshold cost of
services requiring pre-authorization to $1,000 and directing the
Board to "issue and maintain a list of pre-authorized procedures"
(WCL § 13-a [5]; L 2007, ch 6, § 28).  Pursuant to this
legislative mandate and at the direction of the executive branch,

the Board promulgated regulations that incorporated the Guidelines developed by various medical experts, and which served as a basis for the list of pre-authorized procedures.  The Board then promulgated regulations that implemented a regulatory scheme whereby reimbursement for medical services would be subject to the Guidelines.  All of this was well within the Board's power and in furtherance of the statute.

The Board went awry when it promulgated regulations that imposed a variance scheme that requires pre-approval for reimbursement requests related to treatment that varies from the Guidelines.  Section 324.3 of the Board's regulations states that a variance for medical care that varies from the Guidelines "must be requested and granted . . . before [that care is]. . . provided to the claimant" (12 NYCRR 324.3 [a] [1]).  Nothing in the language of the statute limits compensation to care approved in advance of treatment unless the pre-authorization requirement of section 13-a (5) applies, and there is no claim that it does here.  Thus, the regulation's preapproval requirement lacks a necessary textual grounding to the extent that it extends the limited pre-authorization requirement of section 13-a (5) to care beyond that specifically enumerated in that section of the statute.  Indeed, it is undisputed that prior to implementation of the regulations, disputes over reimbursement for medical services other than those in section 13-a (5) were usually resolved after the services had been provided.

In this regard, the Board's regulations also undermine the purpose of the 2007 amendment "to remove impediments to prompt diagnostic and treatment measures" (see Governor's Program Bill Memorandum, Bill Jacket, L 2007, ch 6, at 5).  The regulation instead serves to hinder timely medical service delivery by denying payment to providers who fail to secure preapproval.  Under the regulation, "a request for a variance will not be considered if the medical care has already been provided" (12 NYCRR 324.3 [a] [1]).  As a result, the preapproval requirement incentivizes providers to delay treatment based on financial concerns.  Realistically, providers will defer medical care until they are certain of reimbursement, which under the regulations means until a variance is granted.  How long this may take is uncertain, and dependent upon the deliberateness of the administrative process.  Such delay carries with it the potential for significant adverse health consequences due to a break in medical services.  In contrast, the statute expressly provides ensured compensation for medically necessary services, making no mention of whether treatment was rendered prior to approval.  The Board's regulation would permit denial of reimbursement even for medically necessary treatment simply because the medical services were provided prior to preapproval.  As a consequence, the regulation is inconsistent with the mandate of section 13 (a).

The Board is also subject to challenge for interpreting its regulations so as to deny Kigin's request for reimbursement

on the ground that her treatment varied from the Guidelines. This interpretation contravenes the statutory and regulatory scheme for individual assessment of compensable injuries, and was not mandated by the 2007 amendments.

Although I agree with the majority that the claimant had the burden to establish that the treatment was compensable under the statute (see majority op. at 10-11), under the Board's interpretation of the regulations the claimant is subject to an adverse presumption that the requested services are not medically necessary simply because they are not included on the pre-authorized list and vary from the Guidelines.

The Board argues, and the majority concludes, that the Legislature's directive to create a list of pre-authorized procedures, also means that the Board has the authority to predetermine that all excluded services are not medically necessary. I disagree. The more logical and reasonable interpretation of the statutory language, and one which furthers the 2007 amendments' purpose to increase benefits to workers, is that the Legislature authorized the Board to pre-determine procedures over which there was general medical consensus, leaving claims regarding other medical services to the preexisting dispute resolution process. That process is better suited to determinations focused on the individual's condition and needs. Whereas the rulemaking process is more appropriate to pronouncements of generalized treatment protocols, without

consideration of specific individualized health concerns (see State Administrative Procedure Act § 102 [2] [a] [defining a "rule" as "the whole or part of each agency statement, regulation or code of <u>general applicability</u> that implements or applies law . . ."] [emphasis added]; <u>see</u> <u>also</u> <u>Alca Indus., Inc. v Delaney</u>, 92 NY2d 775, 778 [1999] [discussing distinction between rulemaking and "ad hoc decision making based on individual facts and circumstances"]).

The statutory language does not support the Board's position that the variance process established by the regulations is consistent with the pre-existing statutory scheme. The source of the Board's authority for the Guidelines, section 13-a (5), merely states that the Board "shall issue and maintain a list of preauthorized procedures." It does not state that excluded procedures are to be treated as presumptively not medically necessary. Since the Guidelines were adopted pursuant to the exercise of the Board's rulemaking power, the Board's interpretation of the statute would permit the regulations to supplant the individualized assessment of medical necessity by establishing a presumption against certain services. We would expect that such a dramatic departure from the prior statutorily established case-by-case approach would be authorized by clear, unambiguous language.

Moreover, the Board's interpretation favors the legislative goal to reduce costs to the detriment of the

legislative goal to increase benefits to workers.  Under the
Board's approach, the claimant faces a previously unknown burden
to rebut a presumption against payment for certain medical
services, and must endure the physical and mental affects of
delays in service pending the outcome of the variance request.
This appears to be in service of cost reduction for its own sake.
For it increases the challenges faced by claimants rather than
"remov[ing] impediments to prompt diagnostic and treatment
measures" (Governor's Program Bill Memorandum, at 5).  Whereas,
both goals are achievable by the adoption of a pre-authorized
list which expedites treatment delivery without automatically
labeling certain medical care medically unnecessary, thus
increasing benefits for workers, and at the same time reducing
the number of claims and parties subjected to the dispute and
variance process, thus containing costs.

     The statutory presumption in favor of claimants
applicable to proceedings to enforce claims for compensation,
found in section 21 (5), illustrates the Legislative commitment
to reducing the burdens faced by claimants in securing benefits,
and further supports the conclusion that the Board's
interpretation is contrary to the statute and the legislative
intent.  Section 21 (5) states that in any proceeding to enforce
a claim for compensation "it shall be presumed in the absence of
substantial evidence to the contrary . . . [t]hat the contents of
medical and surgical reports introduced in evidence by claimants

for compensation shall constitute prima facie evidence of fact as to the matter contained therein." No such presumption applies to the carrier/employer's medical evidence.

The presumption clearly indicates the Legislature's intention to ease the claimant's burden of establishing a right to reimbursement for treatment. The Board's interpretation undermines that intent because it requires the claimant to establish by facts and opinion that the treatment is medically necessary, without benefit of the fact presumption, and it eliminates the carrier/employer's burden to rebut the presumption with substantial evidence to the contrary.

Here, the Board determined that Kigin's medical provider failed to establish that the request for compensation for additional acupuncture treatments was medically necessary. That determination, however, was based on the independent medical examination and report of Dr. Chiu, who concluded that the treatments were not medically necessary because Kigin was not disabled and the treatments failed to comply with the Guidelines. This was error, as the Board had previously classified Kigin as permanently partially disabled, and Dr. Chiu should have evaluated the services not as against generalized Guidelines of pre-authorized treatment, but based on the medical care's impact on Kigin's conditions and needs.

I dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed, with costs.  Opinion by Judge Pigott.  Judges
Read, Smith and Abdus-Salaam concur.  Judge Rivera dissents in an
opinion in which Chief Judge Lippman and Judge Graffeo concur.


Decided November 20, 2014